**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  10-20076-CR-UNGARO/SIMONTON**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DAVID ST. VILLIEN,

      Defendant.

_____/

### REPORT AND RECOMMENDATION

      Presently pending before the Court is Defendant's Motion to Suppress (DE # 18). This motion is referred to the undersigned Magistrate Judge (DE # 20).  The Government has responded in opposition (DE # 21).  An evidentiary hearing was held on May 10, 2010.  At the conclusion of the hearing, the undersigned Magistrate Judge orally announced her findings of fact and conclusions of law, ruling that she would recommend that the Motion be denied.  The parties were advised to order a transcript of the hearing if they intended to file objections.  This Report and Recommendation incorporates by reference those rulings, and sets forth the findings and conclusions in greater detail.

      I.     **BACKGROUND**

      Defendant David St. Villien is charged in a three-count Indictment with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count 1); knowingly and intentionally possessing with intent to distribute at least five grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count 2); and with possession of a firearm in furtherance of the drug trafficking crime alleged in Count 2, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3).  The evidence which forms the basis for

these charges was seized from the Defendant's residence on September 30, 2009.  This evidence is subject of the present Motion to Suppress, in which the Defendant contends the seizure was unlawful.

II.      **THE MOTION TO SUPPRESS**

In the written motion filed by predecessor counsel,[1] the Defendant challenges the legality of the entry by the police into his apartment, and the subsequent search which resulted in the seizure of the evidence found therein–including the cocaine base, firearm and ammunition which form the basis of the Indictment, as well as other incriminating evidence (DE # 18).  Specifically, he contends that the entry into the apartment was unlawful under the Fourth Amendment since there was no search warrant and the occupants did not consent to the entry, nor was there any incriminating evidence in plain view under circumstances which would justify entry into the residence. Specifically, the Motion alleges that the door to the apartment was not opened wide enough for the police to see inside, and therefore there was no cocaine in plain view before they entered.  In addition, the Motion alleges that the subsequent consent to search the apartment was not valid.  At the hearing, new counsel elaborated on these arguments, arguing, in addition, that the police had probable cause to obtain a warrant prior to approaching the residence, and therefore, even assuming that the police were able to see cocaine in plain view from outside the apartment,  there were no exigent circumstances which would justify a warrantless entry.  Defense counsel also argued that the consent was invalid not only because it was the product of the illegal entry, but

---

[1]  The Motion was filed by the Office of the Federal Public Defender, which was appointed to represent Mr. St. Villien.  After the Motion was filed, the Federal Public Defender's Office moved to withdraw due to a conflict based upon its representation of another person.  That motion was granted, and successor counsel was appointed.

also because it was coerced.[2]

In opposition, the Government argues that the police lawfully approached the Defendant's apartment in order to investigate information they had received which stated that illegal drug trafficking was occurring at that residence (DE # 21).  Once the door was opened by the Defendant's father-in-law, the police observed the Defendant with a baggie of crack cocaine in his hand.  At that point, the police entered the residence based upon probable cause to believe a crime was being committed and exigent circumstances existed due to the need to recover the contraband.  Thereafter, the Defendant, his wife, and parents-in-law validly consented to the search of the residence which resulted in the seizure of the aforementioned evidence (DE # 21 at 3).

III.   **THE EVIDENTIARY HEARING**

A.   **Introduction**

At the evidentiary hearing, the Government called as witnesses Detectives Harold Geisse and Ariel Perez of the City of Miami Police Department, and Special Agent Javier Ribas of the Bureau of Alcohol, Tobacco, Firearms and Explosives.[3]  The Government introduced into evidence nine photographs of the residence (GX 1 - GX 9), as well as a copy of the Consent to Search Form signed by the Defendant, his wife and her parents (GX 10), and a written statement signed by the Defendant following his arrest (GX 11).

----

[2]  The written motion did not directly challenge the validity of the consent apart from the contention that it was the product of the illegal entry.  However, new defense counsel developed this evidence at the hearing, and the government was able to address this issue during the hearing.  Therefore, although the issue of consent was not separately briefed, the undersigned permitted it to be raised at the hearing.

[3]  Detective Oliva, the officer who observed the Defendant holding a baggie of crack cocaine, and first entered the apartment, was subpoenaed to testify at this hearing.  However, shortly before the hearing he suffered the latest in a series of  heart attacks, and was unavailable to testify (DE ## 30, 36).

The Defendant did not testify, but called as witnesses Pablina Barberena (his wife), Salvador Barberena (his father-in-law), and Maria Barberena (his mother-in-law).

The testimony of the Government's witnesses regarding the events which led to the entry into and search of the residence was directly contradicted in most material respects by the Defendant's witnesses.  As announced at the conclusion of the hearing and discussed in more detail below, based upon the demeanor of the witnesses, as well as the inherent implausibility of the testimony given by the defense witnesses, as contrasted with the forthright, consistent and plausible testimony of the police officers, the undersigned credits the testimony of the Government's witnesses regarding the relevant events.  The Findings of Fact set forth below in Part B of this Section are based on this credibility determination.  Thereafter, in Part C, the testimony of the Defendant's witnesses is summarized, together with a discussion regarding why this testimony is not credible.

> **B.**   **Findings of Fact[4]**

On September 30, 2009, City of Miami Police Detectives Harold Geisse, Ariel Perez and Jose Oliva were assigned as patrol officers in the Little Havana area.[5]  Officer Oliva has been a police officer for approximately 12 to 15 years; Officers Geisse and Perez had been police officers for approximately 3 years.   At approximately 9:30 p.m., the officers met, and Officer Oliva told them that he had received information that one of the main narcotics distributors in the area, known as "Gucci," lived at the location of 658 N.W. 1st

---

[4]  To the extent that these Findings of Fact are more properly characterized as Conclusions of Law, and vice versa, the undersigned intends that they be treated as such.

[5]  Although all three men were detectives at the time of the evidentiary hearing, they were patrol officers at the time of the relevant events, and therefore they are referred to as officers in this Report and Recommendation.

Street, Apartment 5.[6]  Officer Perez had previously received anonymous tips that a black male named "Gucci" delivered crack cocaine to distributors and users in the Little Havana area, and drove a black Maxima and a bicycle.  Approximately one week earlier, Officer Perez had conducted a traffic stop of a black Maxima that rolled through a stop sign.  The Defendant was driving that car.  The Defendant provided his driver's license, and was given a verbal warning.  A cursory look into the car did not reveal any narcotics. Based upon this information, the officers decided to further their investigation by going to that apartment to conduct a "knock and talk."  The purpose for this action was to try to verify the information they had received.

At approximately 10:00 p.m., Officers Geisse and Oliva went to the front door of the apartment, and Officer Perez stationed himself on the ground at the rear of the apartment, below a balcony, in a position that would enable him to see any contraband that might be thrown out the back door, or any persons who left the apartment via the door to the balcony.  The police officers were dressed in police uniforms at the time, and had firearms, which were holstered.

Officer Oliva approached the front door first, and Officer Geisse remained behind him, on the steps that led to the front door.  Officer Oliva knocked on the door, which was answered by Salvador Barberena.  Mr. Barberena opened the door sufficiently wide to permit Officer Oliva to view the inside of the apartment, as depicted in GX 1 and GX 3. Officer Oliva told Mr. Barberena that they were officers with the City of Miami Police Department, and that they had received complaints that narcotics were being sold from

---

[6]  Officer Geisse believed that the information came from a reliable confidential informant.  Officer Perez testified unequivocally that the information received by Officer Oliva did not come from a documented confidential informant, that it was an anonymous tip from a concerned citizen.

5

the apartment.  Officer Oliva had spoken to Mr. Barberena for only a few seconds, when he observed the Defendant inside the apartment, wearing blue latex gloves, and carrying a small baggie which appeared to contain crack cocaine.  The Defendant held the baggie at chest level, and appeared to be breaking up the cocaine inside the baggie.  The Defendant was approximately four feet away from the door, and appeared to be coming from the direction of the bedroom.  When he saw this, Officer Oliva rushed past Mr. Barberena and entered the apartment, followed by Officer Geisse.  They then handcuffed and detained the Defendant.[7]  The Defendant was taken outside the apartment and seated on the stairs leading to the front door.

Officers Geisse and Oliva then told Officer Perez to come to the apartment, and to bring a consent to search form.  When they received this form, Officers Geisse and Oliva re-entered the apartment and spoke to Pablina Barberena.  Officer Perez remained outside with the Defendant.

Officer Geisse explained to Pablina Barberena why they were there, and that they

---

[7]  Officer Geisse did not see the Defendant until Officer Oliva entered the apartment ahead of him.  Officer Geisse testified that subsequently Officer Oliva stated that he had seen the Defendant come into view, that the Defendant had his hands raised up about chest level, that the Defendant was wearing blue latex gloves and had a baggie containing what he recognized to be suspected rock cocaine, and that the Defendant was breaking up the rock cocaine in the baggie. As Officer Geisse entered the apartment behind Officer Oliva, Officer Geisse saw the Defendant wearing the latex gloves and holding the baggie of crack cocaine.  As stated previously, Officer Oliva was not available to testify due to a heart attack.   It is well settled that the Federal Rules of Evidence do not apply at suppression hearings, and hearsay is admissible.  *See United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("[T]he interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.  At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.  *United States v. Matlock*, 415 U.S. 164, 172-74 (1974); *Brinegar v. United States*, 338 U.S. 160, 172-74 (1940); Fed. Rules Evid. 104(a), 1101(d)(1)."); *accord United States v. Bent-Santana*, 774 F.2d 1545, 1552 (11th Cir. 1985) (hearsay objection properly overruled by District Judge since "the Federal Rules of Evidence do not apply to suppression hearings.").

had a consent to search form.  The officers did not have their guns drawn, and Officer Geisse told her that she was not being coerced, and that she was being asked to consent of her own free will.  He handed the form to her, and asked if she could read.  When she said she could read, Officer Geisse asked her to read the form aloud, which she did.  He then asked her if she understood what she had read, and she again said, "Yes."  She then signed the form.

Officer Geisse, along with Pablina Barberena, then spoke to Salvador and Maria Barberena, who were the only other people in the apartment at that time, other than the baby of the Defendant and Pablina Barberena.  He spoke to them in Spanish since they did not speak English.  Officer Geisse reviewed and translated the consent to search form, and they stated that they understood.  They consented to the search, and signed the form, stating that they did not have anything to hide.  Mr. and Mrs. Barberena were seated when the form was read to them, and they were not restrained or threatened with arrest.  None of the officers had their guns drawn.

Officers Geisse and Oliva then went outside and spoke to the Defendant, who was being guarded by Officer Perez.  They removed the Defendant's handcuffs and gave him the form to read.  The Defendant read the form aloud, stated that he understood it, and signed the form.  The Defendant was not threatened, and was not told that if he did not sign the form, the other people in the house would be arrested, and his child would be taken away.

The form, which was admitted into evidence as GX 10, states the following:

CONSTITUTIONAL RIGHTS  – SEARCH BY CONSENT

BEFORE ANY SEARCH IS MADE, YOU MUST UNDERSTAND YOUR RIGHTS.

1.    You may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the

premises described below.

2.     If you consent to a search, anything of evidentiary value
seized in the course of the search can and will be introduced
into evidence in court against you.

I, <u>DAVID ST. VILLIEN</u>, HAVE READ THE ABOVE STATEMENT OF MY
RIGHTS AND AM FULLY AWARE OF THE SAID RIGHTS. SALVADOR B.
PEREZ   PABLINA BARBERENA   MARIA BARBERENA [names are
handwritten onto the form in the places indicated]

I HEREBY CONSENT TO A SEARCH WITHOUT WARRANT BY OFFICERS OF
THE CITY OF MIAMI POLICE DEPARTMENT OF THE FOLLOWING
(Describe premises or automobile):

| 658 NW 1 ST # 5 |
| MIAMI, FL |

I HEREBY AUTHORIZE THE SAID OFFICERS TO SEIZE ANY ARTICLE
WHICH THEY MAY DEEM TO BE OF EVIDENTIARY VALUE.

THIS STATEMENT IS SIGNED OF MY OWN FREE WILL WITHOUT ANY
THREATS OR PROMISES HAVING BEEN MADE TO ME.

The form is signed by Maria Barberena, Salvador Barberena, Pablina Barberena, and the

Defendant, David St. Villien, and contains the date and time of September 30, 2009, at

10:10 p.m.

After receiving consent to search, Officer Geisse searched the apartment.  Inside

the Defendant's bedroom, he saw narcotics located on a plate on the floor in front of the

closet and a computer desk.  The location of the narcotics is depicted in GX 6, which

shows the bedroom and the location of the narcotics in the bedroom;  and, GX 7, which

is a close up photograph of the round glass plate which contained several large pieces

of loose crack cocaine, a razor blade, two scales, and small baggies, some of which

have crack cocaine inside them.  Some of these baggies are clear, with blue dolphins on

them, and match the baggie that Officer Geisse saw in the Defendant's hands when he

was initially detained.  Near the computer desk, there was a semi-automatic 9 mm pistol,

an extra magazine for that gun, and an empty magazine for an AK47 rifle.  Officer Geisse

8

removed the handgun for safety reasons and locked it in the trunk of his car.  GX 8 is a photograph which shows the extra handgun magazine on the computer desk.  The loaded handgun, which had been removed by Officer Geisse, had been to the left of the magazine.  The AK47 empty magazine was located next to the handgun and the extra magazine for the handgun.

After the drugs were discovered, Officer Perez advised the Defendant of his Miranda rights by reading from his Miranda card.  Specifically, Officer Perez stated, "You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer before and during any questioning.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.  You can decide at any time to exercise these rights and not answer any questions or make any statements.  Do you understand each of these rights I have explained to you?  Having these rights in mind, do you wish to talk to us?"  The Defendant nodded yes to each of the statements.  The Defendant then started talking to Officer Perez, and also made a written statement, which was admitted into evidence as GX 11.  The written statement said, "My family has nothing to do with it[.]  all on me.  my shit[.]  I smoke and they don't know."  The Defendant said that he was wearing the blue gloves because he had previously been addicted to crack cocaine and the gloves would keep him from getting the cocaine on his hands so that he would not return to using cocaine.  He asked what he was being charged with, and Officer Perez responded that Officer Oliva was the primary officer who would make that decision, but he believed the Defendant would be charged with trafficking.  The Defendant became upset, and asked how he could be charged with trafficking when there was less than 28 grams.  Officer Perez testified that the significance of this statement was that under state law the

demarcation point for trafficking was over 28 grams.  When the Defendant learned that he might be charged with armed trafficking, he stated that the gun belonged to his wife. Officer Perez told the Defendant that he didn't have to worry as long as his fingerprints were not on the gun.  The Defendant then responded, "Of course I'm going to have fingerprints on the gun."

Expert analysis has revealed that the Defendant's fingerprints were found on both of the magazines for the 9 mm pistol found in his bedroom.  The Defendant has three prior convictions, one in 2006, and two in 2007.  The arrest forms for both of the 2007 arrests reflect that he was arrested for selling crack cocaine on the street, approximately half a block from the subject premises, and that he had given the subject premises as his permanent address.

### C.   The Defense Witnesses

The testimony of each of the defense witnesses is summarized below.  The undersigned does not credit their testimony to the extent that it contradicts the events described by the police officers.  This credibility determination is based upon their demeanor, as contrasted with the demeanor of the officers, as well as a common sense determination that parts of their testimony did not make sense.  In addition, all three witnesses are close to the Defendant, and are motivated to testify on his behalf.  With respect to Salvador Barberena and Maria Barberena, their testimony seemed rehearsed with respect to the main point that the police rushed into the house as soon as the door was opened, and that the Defendant was located in a position where he could not have been seen by the police when they were standing outside of the apartment; and, seemed confused with respect to other circumstances.  The testimony of Pablina Barberena did not seem rehearsed or confused, but, as explained below was clearly incredible.

10

### 1.  *Salvador Barberena*

Salvador Barberena testified that he is 75 years old, and both he and his wife are retired.  He rents the apartment where the search occurred, and has lived there with his wife and daughter for approximately four years.  Mr. Barberena initially testified that the Defendant did not live there, but "just comes over to the house," and that he didn't know where the Defendant lived. He then testified that the Defendant had lived there for about two years, and that he gave money to help with the household, but that money was given to his daughter, Pablina.  Mr. Barberena testified that on the day of the arrest, he, his wife, his daughter and her baby were sitting on the sofa watching TV.  Mr. Barberena initially stated that the Defendant was standing on the other side of the sofa watching TV, and then stated that the Defendant was sitting with them on the sofa.  Mr. Barberena was later asked to place an "X" on GX 3 to show where the Defendant was standing, and he placed an "X" in the area near the hallway between the two bedrooms.

Mr. Barberena testified that while they were watching TV, he heard a strong knock on the door, and he answered the door.  He opened the door halfway, and an officer with a pistol in his hand forced his way in and pushed Mr. Barberena to the floor.  Mr. Barberena testified that when the police came in, the others were watching TV and were in front of the door, but the Defendant was sitting on the other side, to the right, and was not visible from the doorway.  He first said that the Defendant was not wearing blue gloves, and then immediately corrected this to say that he did not notice the Defendant wearing blue gloves because he was on the other side of the sofa.  He further testified that when the police came in, they grabbed the Defendant and took him outside.  The police told everybody inside the apartment not to move, and they then searched the apartment.  The police then took out a piece of paper and told the Defendant that if he

didn't sign the paper, they would arrest everybody, including the baby.  They then pulled his daughter, Pablina Barberena, outside and handcuffed her.  Mr. Barberena said that he signed the paper because he was afraid that the police were going to arrest everyone, and that the baby would also be taken away.  Mr. Barberena acknowledged that it had been hard on everybody for the Defendant to be in jail, and in response to the question, "And you'd like to help him get out of jail, wouldn't you?" Mr. Barberena responded, "Not everybody deserves to be in jail. . . . we're all human."

### 2.  *Maria Barberena*

Maria Barberena, the defendant's 67-year-old mother-in-law, testified that when the police came they were all watching TV.  The Defendant was also watching TV, but was standing next to the wall in the hallway near the bedrooms.  The Defendant was not visible from the doorway, and the police would not have been able to see him unless they entered the apartment.  She heard the police knock on the front door, and when her husband opened the door, the police did not say anything, but entered with their guns drawn, pushed her husband and threw him on the sofa, and then they grabbed the Defendant, handcuffed him, and took him outside.  She testified that she signed the form because they forced her to do so, telling her and her husband that if they did not sign the form, they would arrest all of them.  She denied that the Defendant was wearing blue gloves at the time.  She testified that the Defendant had lived with them for four or five years, ever since they began renting the apartment.  She was not aware that the Defendant is a convicted felon, or that he had been previously arrested for selling drugs.  She was not aware that there was a gun in the apartment, and her daughter had never told her that she had a gun.  She also was not aware that there were drugs in the apartment, and she had never seen drugs in the apartment before.  She had never seen

12

the plate found in the Defendant's bedroom with drugs and paraphernalia on it.

### 3. *Pablina Barberena*

Pablina Barberena testified that she lived with her parents, her baby and the Defendant at the subject premises. She is a student at Dade Medical College, and at the time of the hearing was employed as a census worker. She testified that the Defendant had lived with her at the apartment from 2004 to 2006, and then he left until his return in March 2009. Between 2006 and March 2009, the Defendant lived with his mother. She knew that he had been arrested once and had gone to prison. On the day of the Defendant's arrest, she was in the living room with her parents and daughter, watching TV. The Defendant was standing in the hallway near the bedroom. There was a loud knock on the door, and her father answered the door. When he opened the door, he fell to the couch and the police ran in with their guns drawn, and told everybody to get on the floor and not to move. She testified that the door was only opened a little bit, just enough for her father to peek out. The police saw the Defendant, and told him he was under arrest. She claimed that the Defendant was not wearing gloves at the time. She could not recall who entered the apartment first, but she thought it was Officer Perez. Officer Oliva also entered the apartment, and she was not sure about whether the third officer stayed outside or also entered. After the Defendant was arrested, the police went into the bedroom, and shouted "ham and cheese." When they left the bedroom, Officer Perez asked if there were any firearms in the house, and she told him she had a firearm. He asked her where it was, and she retrieved it and gave it to him. She testified that she had bought the firearm in March 2009 because she was afraid of an ex-boyfriend, Dean Lue. She had obtained a temporary restraining order against him in November 2005, but had voluntarily dismissed the case approximately two weeks later. She never obtained a

13

new restraining order because when they went before the judge, Lue stated that he was going to leave her alone, and she thought the matter was resolved.

After the police left the bedroom and retrieved the firearm, they talked among themselves, and then told her mother that they had found drugs and that she was going to have to sign a paper or everybody would be arrested and they would lose the baby. Officer Oliva then went outside and told the Defendant to sign the paper, and he refused. Office Oliva re-entered the apartment and told Pablina Barberena to give the baby to her mother.  He then told her to put her hands behind her back, handcuffed her, placed her under arrest, and sat her outside next to the Defendant.  Officer Oliva then asked the Defendant again to sign the paper.  When the Defendant asked Officer Oliva why he was doing this, Officer Oliva responded that the father was next, and told her father to come to them.  The police did not make her father go outside, but told him to sit down.  At that point, the Defendant responded, "That's enough," and signed the paper.  Officer Perez then told the Defendant to write a statement because it would be better in court.  Pablina Barberena testified that she then signed the paper because Officer Oliva told her she needed to do so if she wanted to keep her baby.

Pablina Barberena identified the room depicted in GX 6 as the bedroom she shared with the Defendant.  She had never seen the glass plate with the drugs on it before they showed it to her when she went inside the room to give the officers her gun. In rebuttal, Officer Geisse testified that if he had become aware that there was a firearm in a house where he was conducting an investigation, he would have never allowed an individual to gain access to that firearm, but that he would recover it himself.

Pablina Barberena also testified that she had never seen any crack cocaine in the apartment before.  She testified that the gun was hidden behind the computer, and that

14

she kept it loaded at all times, with a loaded spare magazine next to it.  She was aware that the Defendant was a convicted felon, but did not know that it was unlawful for him to possess a firearm.  She also testified that he was not aware of the firearm, and that it would surprise her to learn that his fingerprints were on both magazines.

### 4.    *The Credibility Determination*

As stated at the outset, in addition to the evaluation of the demeanor of the witnesses, and their motivation to testify favorably to the Defendant, there are specific inconsistencies and facts that defy common sense which lead the undersigned to reject their version of events.  The following are some of the specific examples which lead to this finding.

Initially, the undersigned notes that the witnesses gave inconsistent versions regarding how long the Defendant had resided at the apartment.  Salvador Barberena first testified that the Defendant did not live there, but just visited the house, he then testified that the Defendant had lived there for about two years.  Maria Barberena testified that the Defendant had lived with them for four or five years, ever since they began renting that apartment.  Pablina Barberena testified that the Defendant had lived with them from 2004 through 2006, and then left until March 2009.[8]

All three witnesses claimed that they, along with the Defendant were watching TV at the time the police arrived, and that the Defendant was either standing or sitting with them, out of view of the front door.  Salvador Barberena went back and forth in his testimony regarding whether the Defendant was standing or sitting, and in a response to a leading question, marked the point on a photograph where the Defendant was

---

[8]  Interestingly, Pablina Barberena testified that she had purchased the semi-automatic pistol found in their bedroom in March 2009.

standing.  Salvador Barberena testified that he had opened the door wide enough for somebody to enter the apartment; Pablina Barberena testified that the door was opened only wide enough for him to peek out.  The written motion to suppress was based entirely on the premise that the door had not been opened wide enough for the police to see inside, a fact which was discredited by Salvador Barberena as well as Officer Geisse.  The undersigned credits the testimony of the Officer Geisse that he and Officer Oliva did not enter the apartment until the Defendant was seen holding crack cocaine.  It does not make sense for the police to rush into the apartment as soon as the door opened, without even attempting to speak to Mr. Barberena, and without knowing whether the Defendant was present.

The testimony of the defense witnesses was also inconsistent with respect to the circumstances surrounding the entry.  Salvador Barberena claimed that the police had pushed him to the floor when they rushed in; his wife and daughter testified that he had been pushed and thrown onto the sofa.  Salvador Barberena first denied that the Defendant was wearing blue gloves, and then said he didn't notice because the Defendant was on the other side of the sofa away from him.  Pablina Barberena testified that the Defendant was not wearing gloves at the time.  It does not make sense that the officers would make up the fact that the Defendant was wearing blue gloves, which was corroborated by the fact that they seized blue gloves.

The Barberenas all denied having ever seen the round glass plate on which the crack cocaine was found, and which was sitting in the middle of the bedroom floor. Maria Barberena and Pablina Barberena both explicitly testified that they had never seen drugs in the apartment.  Their story that the Defendant was watching TV with them simply does not make sense, when considered in conjunction with the fact that the

police found a round glass plate which contained partially loose large pieces of crack cocaine, and partially bagged crack cocaine, with scales and a razor blade on the floor of his bedroom, and in view of their claimed lack of knowledge of drugs in the apartment. It seems unlikely that the Defendant would leave the crack cocaine and all of the drug paraphernalia laying around if the family was unaware of it, or that he would stop in the middle of packaging cocaine to watch TV with the family.[9]

Similarly, the undersigned finds incredible Pablina Barberena's testimony that she had purchased the gun in March 2009 to protect herself from a former boyfriend, and had hidden it in the bedroom she shared with the Defendant, but had not told him about the loaded gun and he was unaware of it.  It is particularly incredible in view of the fact that the Defendant's fingerprints were found on both the magazine that was inside the gun and the extra magazine that was next to the gun; as well as her claim that she did not know it was illegal for him to possess a gun since he is a convicted felon and therefore there would be no reason for her not to tell him about the gun.  Moreover, accepting her testimony would mean not only that she had not told him about the gun, but that he had not told her that he had found the gun and handled the magazines.

Finally, Pablina Barberena's testimony that the police allowed her to retrieve the gun after telling them about it also defies logic, as well as the standard police procedures described by Officer Geisse.  Moreover, her testimony that she showed them the gun is inconsistent with her testimony that they conducted the search immediately

---

[9]  The Government's scenario, that when the police knocked on the door, the Defendant, who was in the process of cutting up crack cocaine and packaging it into individual baggies for distribution, came out of the bedroom to see if it was one of his customers, makes more sense.  Whatever his reason, however, the undersigned credits the testimony of the police that he came into view carrying a baggie of cocaine a few seconds after the door was opened.

upon entering the apartment, and obtained the consent to search later.  It is possible, of course, to construe her testimony to indicate that the police missed the firearm during the earlier search, but the photographs demonstrate that the firearm, or at least the extra magazine which was next to it, were in plain view upon entering the bedroom.

Having expressly discredited the testimony of the Barberena family with respect to the circumstances surrounding the entry and search, the undersigned also disbelieves their testimony regarding the consent to search.  once the police had secured the premises, it would have been easy to obtain a search.  It seems unlikely that the police would handcuff and arrest the Defendant's wife, threaten to arrest her elderly parents, and threaten to remove the baby, in order to coerce consent; and, that despite this alleged mistreatment, all four individuals who consented would have falsely acknowledged in writing that they freely and voluntarily consented to the search.   It is also noteworthy that when describing the sequence of events, Maria Barberena did not mention that her daughter was arrested and handcuffed.

In sum, based upon the many inconsistent and implausible features of the testimony of the Barberenas, the undersigned rejects their testimony to the extent it contradicts the testimony of the police officers.

IV.    CONCLUSIONS OF LAW AND LEGAL ANALYSIS

A.    The Entry Into the Residence Was Lawful Based Upon
Probable Cause to Believe a Crime Was Being
Committed and Exigent Circumstances

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, and warrantless searches and seizures inside a residence are presumptively unreasonable.  *United States v. McGough*, 412 F.3d 1232, 1237 (11th Cir. 2005).  However, the United States Supreme Court "has crafted a few carefully drawn

exceptions to the warrant requirement to cover situations where the public interest require[s] some flexibility." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). One such exception is where the facts and circumstances establish probable cause to believe that the defendant has committed a crime *and* exigent circumstances justify the failure to obtain a warrant prior to making the arrest or seizure of evidence. The exigent circumstances doctrine encompasses situations where resort to a magistrate for a search warrant is not feasible or advisable, including, *inter alia* : (1) danger of flight or escape; (2) possibility of loss or destruction of evidence; and (3) hot pursuit of a fleeing suspect. *Id*. This doctrine is particularly applicable in narcotics cases because contraband can be easily and quickly destroyed. *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990). As stated by the Eleventh Circuit in *United States v. Ramos*, 933 F.2d 968, 972 (11th Cir. 1991):

> Warrantless and nonconsensual entry into a suspect's house to make a felony arrest is prohibited under the fourth amendment, unless probable cause and exigent circumstances exist. *See Payton v. New York*, 455 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L.Ed. 2d 639 (1980). "Probable cause to search exists where the facts lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime.'" *United States v. Burgos*, 720 F.2d 1520 (11th Cir. 1983). Exigent circumstances exist "when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Satterfield*, 743 F.2d 827, 844 (11th Cir. 1984).

*Accord United States v. Rodgers*, 924 F.2d 218 (11th Cir. 1991).

In *United States v. Santa*, 236 F.3d 662 (11th Cir. 2000), the Eleventh Circuit set forth the analysis which must be used to determine whether exigent circumstances justify a warrantless entry:

> The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983). Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal or concealment of evidence; and 'hot pursuit' of a

fleeing suspect." *Blasco*, 702 F.2d at 1325.

> This circuit has recognized that "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." *Tobin*, 923 F.2d at 1510 . . . "The mere presence of contraband, however, does not give rise to exigent circumstances." *Lynch*, 934 F.2d at 1232. "The test of whether exigent circumstances exist is an objective one. '[T]he appropriate inquiry is whether the facts ... would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" *Tobin*, 923 F.2d at 1510 . . . .

236 F.2d at 662.

The Court emphasized, however, that the exigency which justifies the warrantless entry cannot be one that is created by the police. Thus, in *Santa*, the Court held that exigent circumstances did not justify the warrantless entry into the defendants' apartment to arrest the defendants where the law enforcement agents had advance notice that the defendants were going to conduct a narcotics transaction with an informant at that location. *Accord United States v. McGregor*, 31 F.3d 1067, 1069 (11th Cir. 1994).

In the case at bar, the police had received information that a drug trafficker known as "Gucci" lived at the subject premises, and was distributing drugs from that location. Based upon the receipt of that information, they reasonably decided to investigate the premises in an effort to verify the information. Once they arrived at the premises, and knocked on the door, Mr. Barberena opened the door. As Officer Oliva began to speak with him to tell him why they were there, he saw the Defendant walk into view carrying a baggie of crack cocaine. The Defendant has not disputed the conclusion that at that point, the police had probable cause to enter the residence, seize the crack cocaine and detain the Defendant. Rather, the only dispute is whether Officer Oliva, in fact, saw the Defendant carrying the crack cocaine before he entered the residence, and the

undersigned has credited the testimony of the officers that he did.

At the hearing, defense counsel suggested that the officers had probable cause to enter the residence before they approached it, and, therefore, the police should have obtained a search warrant rather than going to the residence to conduct their investigation.  In other words, defense counsel suggested that the police had created the exigency.  Unlike *Santa*, however, the police in the case at bar did not have specific information that a narcotics transaction was going to occur at that location at any specific time, or that narcotics would be in the apartment at that specific time. Moreover, although Officer Perez had previously received information that "Gucci" drove a black Maxima, and Officer Perez had, approximately a week before, stopped a black Maxima driven by the Defendant, no drugs had been found in the car.  The evidence presented at the evidentiary hearing, therefore, did not establish probable cause to support a search of the apartment prior to the appearance of the Defendant holding crack cocaine. Thus, the police did not create the exigency which led them to enter the residence, and the entry and arrest of the Defendant were not unreasonable, and were lawful under the Fourth Amendment.

> **B.**   **The Defendant and His Family Knowingly and Voluntarily Consented to the Search of the Residence**

The issue of whether a person has voluntarily consented to the search of a residence is a question of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).  The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given.  *Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Matlock*, 415 U.S. 164 (1974).  In *Blake*, the Eleventh

Circuit established the following factors to be used to assess the validity of a consent to search: the custodial status; the presence of coercive police procedures; the extent and level of the person's cooperation with the police; awareness of the right to refuse to consent to the search; intelligence and education, and the belief that no incriminating evidence will be found. *Blake*, 888 F.2d at 798. *Accord United States v. Simms*, 385 F.3d 1347, 1355 (11th Cir. 2004).

Numerous cases have examined the voluntariness of a defendant's consent to search. In the following cases, the courts determined that the consent to search was voluntary: *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002) (consent voluntary despite fact that four agents approached defendant's residence shortly before midnight, and requested admittance to determine whether there were any counterfeit documents located inside the residence, where defendant was specifically advised of his right to refuse consent and signed written consent form, despite defendant's claim that he did not believe he had a choice); *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (defendant's consent was voluntary despite prior protective sweep, fact that defendant was arrested outside his house and brought inside in handcuffs, the presence of 14 armed agents, and the defendant's initial refusal to consent to the search of the entire premises, where the agents advised the defendant of his rights, and did not threaten the defendant, but merely stated that if he did not consent to search of entire house they would secure the premises and attempt to obtain a search warrant); *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (consent was voluntary where defendant had been stopped at gunpoint, frisked, and placed face down on the road, since officers spoke in conversational tone, had reholstered their weapons, did not threaten defendant, and defendant was not handcuffed).

The Supreme Court has emphasized that voluntariness of consent must be based on the totality of the circumstances, and no one factor is dispositive. *United States v. Drayton*, 536 U.S. 194 (2002).  Therefore, in determining voluntariness in the case at bar, the undersigned has considered the totality of the circumstances, in light of each of the *Blake* factors.

Once the police entered the residence, they detained the Defendant and secured the residence by having everyone remain in view.  At that point, they spoke to the Defendant's wife and parents, and requested their consent to a search of the apartment. The police advised them orally and in writing that they had the right to refuse consent, and could require the police to obtain a search warrant.  They all understood their rights and consented to the search by signing this form, which is set forth verbatim above. There were only two police officers inside the residence, with a third officer outside watching the Defendant, which is not an overwhelming police presence.  The officers never drew their guns, there were no threats, and the family members were seated in familiar surroundings and not in custody.  Although Mr.  and Mrs. Barberena are elderly, and their testimony was somewhat confused, at the time of the search they were assisted by their daughter with respect to understanding the consent to search form. Pablina Barberena is a student at Dade Medical College, and appears to be very intelligent.  Under the totality of the circumstances, the undersigned finds and concludes that their consent to search was knowingly, intelligently and voluntarily given.

The Defendant was also asked to consent to the search.  He is in a somewhat different situation since he had been arrested and was handcuffed outside the apartment at the time he was approached.  However, he was clearly advised of his right to refuse consent, he was not threatened, no guns were drawn, and he was experienced with the

criminal justice system, and therefore less likely to be intimidated or overwhelmed by the circumstances of his arrest.  Like his wife and parents-in-law, he signed the form, which expressly stated that he had the right to refuse consent, and that he gave consent of his own free will, without any threats or promises having been made.  In addition, he was cooperative with the police, as evidenced by the fact that after he was advised of his *Miranda* rights he waived those rights, spoke to the police, and wrote a statement in which he exculpated the Barberena family and claimed sole responsibility for the drugs. Under the totality of the circumstances, the undersigned finds and concludes that the Defendant's consent to search was also knowingly, intelligently and voluntarily given.

> **C.**  **The Search of the Residence and Seizure of Evidence**
> **Did Not Violate the Fourth Amendment to the United**
> **States Constitution**

Since the entry into the Defendant's residence was lawful, and thereafter the Defendant, his wife and his parents-in-law knowingly, intelligently and voluntarily consented to a search of the entire premises, the undersigned finds that the search and seizure of the evidence at issue was reasonable within the meaning of the Fourth Amendment to the United States Constitution.

**V.**  **CONCLUSION**

Based upon the foregoing Findings of Fact and Conclusions of Law, the undersigned hereby

**RECOMMENDS** that the Motion to Suppress (DE # 18) be **DENIED**.

The parties will have fourteen calendar days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v.*

*Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149

(11th Cir. 1993).

**DONE AND SUBMITTED** in Miami, Florida, on May 17, 2010.

_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

**Copies furnished via CM/ECF to:**
**The Honorable Ursula Ungaro, United States District Judge**
**All counsel of record**